1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

ERIN DEAN RIEMAN,

11

Petitioner,

CASE NO. 3:16-CV-05250-RBL-JRC

ORDER FOR EVIDENTIARY
HEARING

12

v.

13

MARGARET GILBERT,

14

Respondent.

15

16      The District Court has referred this petition for a writ of habeas corpus to United States

17   Magistrate Judge J. Richard Creatura. The Court's authority for the referral is 28 U.S.C. §

18   636(b)(1)(A) and (B), and local Magistrate Judge Rules MJR3 and MJR4. Petitioner filed the

19   petition pursuant to 28 U.S.C. § 2254.

20      Petitioner Erin Dean Rieman and John Adkins were partners on a fishing boat. They

21   hired Walter Bremmer as temporary crew. One night, after the three men went ashore, Adkins

22   disappeared. Although his blood was found on the boat, Adkins's body was never found. After

23   being granted full immunity, Bremmer gave a statement stating that petitioner beat and strangled

24

1 | Adkins and then he and petitioner disposed of Adkins's body at sea. Petitioner entered a not

2 | guilty plea to the charge of murder, but never offered his side of the story. Instead, he remained

3 | silent.

4 |       Petitioner ultimately agreed to an *Alford* plea to manslaughter and was sentenced to 12

5 | years in prison. Over two years later, Bremmer was arrested and later convicted for murdering a

6 | man in Hawaii by strangulation. After petitioner learned that Bremmer was incarcerated, he

7 | came forward for the first time with his own version of how Adkins was killed. He states that

8 | Bremmer was the true murderer and that Bremmer beat and strangled Adkins. He states that

9 | Bremmer threatened to kill petitioner and his family if petitioner ever implicated him. Since

10 | Bremmer was in Hawaii, where petitioner's daughter and grandchildren lived, he believed that

11 | Bremmer would carry through with his threat. Therefore, he went to prison rather than implicate

12 | Bremmer in Adkin's death.

13 |       His petition is otherwise procedurally barred as untimely because it was filed beyond the

14 | statute of limitations. Therefore, he can only proceed if he can demonstrate that his petition is

15 | one of the narrow class implicating a "miscarriage of justice" and that he was "actually innocent"

16 | of the crime. Here, based on a preponderance of all of the evidence now presented, this Court

17 | finds that no reasonable juror would have found petitioner guilty of manslaughter beyond a

18 | reasonable doubt. Therefore, petitioner's habeas petition is not procedurally barred and his

19 | petition may be examined on the merits. The Court, therefore, directs the parties to appear for an

20 | evidentiary hearing to determine if his plea was impacted by Bremmer's threats.

21 | **FACTS AND PROCEDURAL HISTORY**

22 | The Washington State Court of Appeals stated the facts of petitioner's case as follows:

23 | On October 20, 2009, the State charged Rieman, as a principal or an accomplice, with one count of second degree murder with aggravating factors, a deadly weapon

24 |

sentence enhancement, and first degree theft. Rieman was accused of murdering John Adkins. After extended negotiations, Rieman agreed to enter an *Alford* plea to an amended charge of first degree manslaughter with an aggravating factor that he used his position of trust, confidence, or fiduciary responsibility to facilitate the offense.

During the plea hearing, the State explained that the "tremendous amount of circumstantial evidence" in the case was tied together by a statement from codefendant Walter Bremmer, who was on a fishing vessel with Adkins and Rieman when Adkins died.[1] Defense counsel acknowledged that Bremmer's statement about Adkins' death was central to Rieman's decision to plead guilty. Counsel added that an extensive investigation had revealed blood and DNA (deoxyribonucleic acid) evidence attributable to Rieman and Adkins but not to Bremmer, and that other evidence from the murder scene corroborated Bremmer's statement.

After an extended colloquy in which Rieman assured the trial court that no one had threatened him and that he was acting of his own free will, Rieman pleaded guilty to the amended charge and agreed to an exceptional sentence of 132 months. On May 21, 2010, the trial court sentenced him accordingly. Rieman did not appeal.

On September 30, 2013, Rieman moved to withdraw his guilty plea and to vacate his sentence under CrR 7.8. Rieman argued that his plea was involuntary because it was coerced by threats from Bremmer, his former codefendant. Rieman asserted for the first time that Bremmer strangled Adkins and then threatened Rieman and his family if Rieman did not "support his story." Rieman argued that he could not reveal these facts or threats until Bremmer's arrest for an unrelated murder charge in Hawaii.

The State moved to strike Rieman's motion on the ground that it was untimely. Following a hearing, the trial court agreed and ruled as follows:

> IT IS HEREBY ORDERED that the motion of the defendant to withdraw his guilty plea is denied. More than one year has elapsed since the defendant was sentenced. The defendant has not made a threshold showing that he meets the requirements for withdrawal of plea as listed in CrR 7.8(b) and RCW 10.73.100.

Rieman moved for reconsideration and argued that the one-year time limit did not apply because Bremmer's arrest in October 2012 constituted newly discovered evidence. The trial court denied reconsideration.

Rieman then filed this appeal, arguing that the trial court erred in denying his motion to withdraw without holding an evidentiary hearing, that the motion was

---

[1] Bremmer apparently received immunity from prosecution in return for his statement. [footnote by Court of Appeals]

timely because of newly discovered evidence, and that he received ineffective assistance of counsel from the attorney who filed the motion. Rieman asserts that we should reverse and remand for a hearing on the merits or treat this matter as a personal restraint petition.

Dkt. 13, Ex. 2 at 1-3; 187 Wn. App. 1036, 2015 WL 3422150 at *1-2 (Div. 2, 2015).

The Court of Appeals converted petitioner's CrR 7.8 motion into a personal restraint petition. Dkt. 13, Ex. 2 at 4. However, the court determined that petitioner's petition was filed outside the one-year statute of limitations and Bremmer's arrest did not constitute newly discovered evidence under RCW 10.73.100(1), so petitioner could not avoid the time bar. *Id*. at 4-5. The court therefore dismissed petitioner's personal restraint petition as untimely. *Id*. at 5.[2]

Petitioner filed a motion for reconsideration with the Court of Appeals (*Id*., Ex.10), which that court denied (*Id*., Ex.12). Petitioner then filed a petition for review with the Washington Supreme Court (*Id*., Ex. 13), which was also denied (*Id*., Ex. 14). The mandate for this case was issued, setting the final judgment date as December 2, 2015. *Id*., Ex. 15.

Petitioner, *pro se*, filed a petition for a writ of habeas corpus with this Court in April of 2016. Dkt. 1. After the Court ordered service on defendant (Dkt. 7) and defendant submitted the state court record (Dkt. 13), the Court appointed counsel for petitioner from the Federal Public Defenders' Office (Dkt. 15). In September of 2016, the Court granted a stipulated motion, staying proceedings until petitioner's counsel could properly investigate his claims. Dkts. 20, 21. The stay expired in September of 2017 (*see* Dkt. 37) and the Court provided leave for both parties to submit supplemental briefing (Dkt. 38). The Federal Public Defenders office has

---

[2] The Court notes that the state court of appeals chose not to consider petitioner's petition on the merits because he had not presented newly discovered evidence to surpass a state-law procedural time bar. However, the standard to surpass the federal time bar is different than the state rule. In federal court, petitioner need only provide newly *presented* evidence – that is, evidence that the trial court did not have the opportunity to analyze – rather than newly *discovered* evidence - that is, evidence that could not have been discovered with reasonable diligence. *See Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003).

1  completed its investigation and both parties have now filed their supplements (Dkts. 39, 45, 47).

2  Pursuant to this Court's order, the parties also appeared for oral argument on January 23, 2018.

3  Dkt. 48; Dkt. Event at 1/11/2018.

**DISCUSSION**

5  **I.      Actual Innocence Excusing Untimeliness and Procedural Default**

6         It is not disputed that petitioner filed his petition well after the statute of limitations, and

7  that it is unexhausted, making it procedurally defaulted. However, petitioner alleges that he can

8  present evidence of his actual innocence, thereby allowing the Court to excuse his procedural

9  default.

10         *A.  Standard for Procedural Actual Innocence*

11         A showing that a petitioner is actually innocent of the crime for which he was convicted

12  can allow a petitioner to avoid both AEDPA's statute of limitations, *see McQuiggin v. Perkins*,

13  569 U.S. 383 (2013), and procedural default of his petition, *see Smith v. Baldwin*, 510 F.3d 1127

14  (9th Cir. 2007). Under *Schlup v. Delo*, a petitioner must produce proof of his actual innocence to

15  bring him "within the narrow class of cases . . . implicating a fundamental miscarriage of

16  justice." 513 U.S. 298, 314-15 (1995) (quotations omitted). A petitioner must "show that it is

17  more likely than not that no reasonable juror would have convicted him in light of the new

18  evidence." *Id*. at 327.[3]

19         A petitioner must support his claim of procedural actual innocence with "new reliable

20  evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

21

---

22         [3] Further, it should be distinguished from the standard in a substantive or "free standing" actual innocence
claim; while *procedural* actual innocence requires proof by a preponderance of the evidence, the level of proof
required for *substantive* actual innocence is, in comparison, "extraordinarily high," *House v. Bell*, 547 U.S. 518, 554
23  (2006) (citing *Herrera v. Collins*, 506 U.S. 390, 417, 418-19 (1993) and the Supreme Court has not resolved
whether a prisoner may be entitled to habeas relief based on a claim of actual innocence. *McQuiggin v. Perkins*, 569
24  U.S. 383, 392 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993).

1  critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Only after

2  petitioner is able to surpass this procedural bar will the Court examine whether or not his *Alford*

3  plea was voluntary.

4      The Court must consider "'all the evidence,' old and new, incriminating and exculpatory,

5  without regard to whether it would necessarily be admitted under 'rules of admissibility that

6  would govern at trial.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28). "[T]he

7  newly presented evidence may . . . call into question the credibility of the witnesses presented at

8  trial." *Schlup*, 513 U.S. at 330. Thus, "the habeas court may have to make some credibility

9  assessments." *Id*. Further, new evidence need not be newly discovered, but only evidence that

10  was not presented at trial. *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003). As the Court

11  noted above, this federal standard is different from the Washington state standard, which requires

12  newly *discovered*, rather than newly *presented*, evidence. *See* RCW 10.73.100(1). If the evidence

13  ultimately "casts doubt on the conviction by undercutting the reliability of the proof of guilt, but

14  not affirmatively proving innocence, that can be enough to allow consideration of otherwise

15  barred claims." *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011). Because such evidence is

16  "obviously unavailable in the vast majority of cases, claims of actual innocence are rarely

17  successful." *Schlup*, 513 U.S. at 324.

18      ***B.  Evidence at Time of Charge***

19      Though the state did not present evidence at trial, because petitioner took a plea, the state

20  did present evidence of his guilt to the state trial court. The most compelling state's evidence is

21  the statement of Walter Bremmer, a codefendant in the case who was given full immunity in

22  exchange for his testimony. *See* Dkt. 39-6 at 4. In an interview with police, Bremmer stated that

23  he, petitioner, and victim John Adkins traveled on Adkins's boat to Ilwaco, Washington on July

24

4, 2009 in order to install improvements on the vessel. *Id*. at 5. According to Bremmer, on the day Adkins disappeared, Bremmer and Adkins went out drinking for much of the day. *Id*. at 6. After Adkins left, Bremmer states he drank by himself before being accidentally locked into the bar by staff. *Id*. at 8. When he was released, he returned to the boat. *Id*. When he returned he states that he saw petitioner beating Adkins. *Id*.

Bremmer states that he heard glass break as he reached the slip where the boat was moored. *Id*. Looking up, he saw through the wheelhouse windows that petitioner was beating and punching Adkins. *Id*. When Bremmer got inside, petitioner had thrown Adkins down into the main cabin and was beginning to strangle him with an extension cord. *Id*. at 9. When Adkins was dead, petitioner threatened Bremmer – stating that he would kill him and his girlfriend if Bremmer didn't stay quiet and help him dispose of the body. *Id*. According to Bremmer, petitioner proceeded to roll Adkins into a sleeping bag and secure the sleeping bag with line before hiding him out of sight. *Id*. at 12. Bremmer stated that petitioner then forced him to help clean the blood that had spattered throughout the boat using bleach and water. *Id*. at 13.

Bremmer stated that petitioner forced him to stay in Ilwaco for one and a half more days, pretending to search for Adkins. *Id*. at 19. He continued to threaten Bremmer. *Id*. at 20. They then left on the boat, sailing about four and a half hours off the coast before tying weights to Adkins's body, as well as other bags of evidence, and throwing them overboard. *Id*. at 21-22. After returning to Oregon, Bremmer eventually approached police, despite the alleged threat to his life, and received full immunity. Police did not recover Adkins's body.

The only physical evidence of the crime was blood found at the scene. The victim's blood was positively identified in both the main cabin and the wheelhouse of the boat on which Adkins

1  was killed. Dkt. 47-1 at 3. Petitioner's blood was identified only in the wheelhouse. *Id*.

2  Bremmer's blood was not identified anywhere at the scene. *Id*.

3        *C. New Evidence That Casts Doubt on the Conviction.*

4        The most significant new evidence is that petitioner has now revealed that Bremmer had

5  threatened him and his family with death if he told the police that Bremmer had committed the

6  homicide.

7        Petitioner's version of the events is set forth in a letter to the Pacific County Prosecutor

8  and his original habeas petition, in which petitioner alleges that Bremmer was the one who

9  murdered Adkins by strangulation. Dkts. 5, 5-1, 39-2.[4] He states that, on the evening in question,

10  petitioner was sleeping when he awoke to see Bremmer and Adkins fighting. Dkt. 39-2 at 3. By

11  the time he was able to get out of the bed, Bremmer had beaten Adkins and cut him with his

12  knife. *Id*. When petitioner tried to stop Bremmer, Bremmer cut petitioner's hands with the same

13  knife. *Id*. After threatening petitioner with a gun, he proceeded to strangle Adkins to death. *Id*.

14  Bremmer then threatened the lives of petitioner and petitioner's girlfriend, as well as petitioner's

15  daughter and two grandchildren living in Hawaii. *Id*. He forced petitioner to help Bremmer clean

16  the scene and dispose of the body. *Id*. A short time after the murder, Bremmer flew to Hawaii,

17  where he remained.[5] It was not until Bremmer's arrest in Hawaii for an unrelated murder that

18  petitioner believed his family was safe and that he could come forward and explain what had

19  happened. *Id*. at 3-4.

20

21

22

---

23      [4] The Court notes that neither of these documents are signed under penalty of perjury. However, because the Court is required to examine all evidence, however admissible at trial, the Court will consider these statements.
    [5] It is unclear from the record when Bremmer moved, but it was no later than his October 19, 2009

24  interview with police at his Hawaii residence. Dkt. 39-5.

Because he entered an *Alford* plea, petitioner has never actually admitted that he killed Adkins and now that Bremmer is safely in custody, petitioner has been adamant that he did not commit the crime. *Id*. at 2.

"I have kept silent all this time to protect my family from a very real and dangerous threat. I did so knowing full well the consequences of my silence. Wouldn't any man protect his daughter, . . . ?" Dkts. 1-2 at 31; 39-2 at 4.

Although his story closely resembles Bremmer's story – but in reverse – there are many reasons to believe petitioner's version, and not Bremmer's. Most significantly, Bremmer has a history of assaulting people by strangulation – at least three events before Adkins's murder and two events after the Adkins's murder.

Petitioner's counsel has now conducted an additional investigation and presented new evidence, not presented to the court at the time of petitioner's plea. That investigation revealed that one of Bremmer's previous girlfriends states that before the Adkins homicide, Bremmer had assaulted and attempted to manually choke her. Dkt. 39-22 at 3. Also, another woman has submitted a statement that Bremmer had raped her and that during that event, Bremmer used his hands to grasp her neck. Dkt. 39-23 at 2-3. In addition, his ex-wife has submitted a statement that Bremmer had also choked her on one occasion. Dkt. 39-24 at 3. All of these incidents had occurred before the Adkins homicide.

In 2012, after the Adkins homicide, Bremmer was arrested and pled guilty to a shooting and strangulation death in Hawaii. His girlfriend at the time stated that she had witnessed the aftermath of the 2012 murder and, in the days after, Bremmer also strangled her with a seatbelt, saying "no witnesses this time." Dkt. 39-19 at 4.

1    In summary, there is significant evidence that Bremmer had chocked or strangled at least

2    five other victims, both before and after the Adkins homicide.

3    By contrast, it should be noted that petitioner had no previous history of assault by

4    strangulation, or *any* violent crime for that matter. *See* Dkt. 13, Ex. 1 at 2 (petitioner's judgment

5    and sentence noting no prior criminal history).  Statistics demonstrate that male death by

6    strangulation is extremely rare.  Dkt. 39-14 at 3. As the likelihood that Bremmer's guilt is

7    compounded by his history of violence by strangulation, so petitioner's innocence is more likely

8    because he has no history of violence.

9    Under the doctrine of "*modus operandi*," Bremmer's past history of assault by

10   strangulation can be compared with the alleged murder so long as the past conduct is "similar

11   enough" to be probative. *See United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997)

12   (holding prior crime was similar enough to present allegation in order to be probative of intent

13   under FRE 404(b)); *United States v. Torrez*, 869 F.3d 291, 301-02 (4th Cir. 2017) (finding prior

14   assaults against women involving sexual violence and strangulation as sufficiently similar for

15   admission); *see also U.S. v. Sablan*, 2008 WL 700172 at *14 (D. Col. 2008) (finding a past

16   assault was "similar enough" to a present assault because it appears to show defendant was the

17   aggressor). Considering all the evidence, regardless of admissibility, Bremmer's attempt to

18   strangle at least three people before Adkins was killed and at least two more subsequent to the

19   Adkins homicide and considering how that form of assault was so similar to the reported assault

20   of Adkins in this case, it appears that this method of assault by Bremmer was something that

21   significantly weighs in favor of petitioner's version of events, and not Bremmer's.

22   The Court of Appeals dismissed this argument of "actual innocence," finding that

23   petitioner's personal restraint petition had not set forth any "newly discovered" evidence that

24

1    could not have been presented at the time of the plea. Dkt. 13, Ex. 2 at 4-5. However, as noted

2    earlier, this is a federal habeas proceeding that does not use Washington's standard for evidence

3    presented after conviction. Here, petitioner must only produce evidence that was not presented at

4    trial, not evidence that was undiscovered at trial. *Griffin*, 350 F.3d at 963. Thus, the Court does

5    not defer to the court of appeals' finding that petitioner's new statements should not be

6    considered. Instead, the Court will consider the statements with the rest of the evidence produced

7    by both parties. [6]

8        ## D. Other Evidence of Bremmer's Unreliability and Petitioner's Innocence

9            Additionally, there are other facts that were available – but unpresented – at the time of

10   petitioner's conviction that also lend credibility to petitioner's story.  For instance, Bremmer

11   made statements that were contradicted by others.  At the time of the incident, Bremmer asserted

12   that he was locked inside a bar when it closed and so did not return to the boat until late at night.

13   Dkt. 35-6 at 8. However, the employee who closed the bar on the night in question stated she did

14   not lock anybody in the bar. Dkt. 39-9 at 4. Further, the owner of the bar stated that, because of

15   the locking mechanisms on the door, it is impossible to be locked in the bar. Dkt. 39-7 at 3. This

16   suggests that Bremmer was looking for an alibi – an alibi that is flawed, at best.

17           Petitioner has submitted a video showing Bremmer returning to the boat when the sun

18   was still out[7] – far earlier than the 11:15 PM the bar closed that night. Dkt. 39, Pet. Suppl. Ex. 4.

19   And certainly, much earlier than when he reported to police that he managed to escape from the

20   locked bar.

21   _____

22       [6] Although sometimes in a federal habeas proceeding, the Court gives deference to a state court's findings
     of fact, 28 U.S.C. § 2254(d), this deference only applies when a state court has made a factual finding on the merits,
     *James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013). Here, the Washington Court of Appeals never got to the merits of

23   the case. Therefore, the state court's findings are not entitled to any deference.
         [7] Petitioner states that the video shows Bremmer returned to the boat at 8:05 PM. Dkt. 39, at 13. Though
     police reports note the videos were time stamped (*see* Dkt. 39-10 at 4), no such time-stamp appears on the video

24   submitted to the Court. Pet'r's Suppl. Ex. 4.

1       Also, tellingly, when questioned by police, Bremmer stated that although he helped clean

2 up the scene, he has no recollection of disposing of a yellow rain slicker. Dkt. 39-6 at 14.

3 However, petitioner has again produced video evidence showing Bremmer disposing of a yellow

4 slicker in a trash can. Dkt. 39, Pet. Suppl. Ex. 10. One can only wonder what physical evidence

5 that yellow slicker would have revealed that is forever lost.  Nonetheless, his disposing of it, and

6 then lying about it, speaks volumes to this Court.

7       Bremmer's statement to police also has internal inconsistencies. He states at one point

8 that he came upon the fight and witnessed petitioner placing an extension cord around Adkins's

9 neck. Dkt. 39-6 at 5. However, he later states that, when he boarded the boat, petitioner already

10 had the cord in place. *Id*. at 9. In another instance, Bremmer states he heard breaking glass and

11 then noticed the fight. *Id*. at 8. However, he later states he saw them fighting and then witnessed

12 Adkins being thrown through a window. *Id*. at 9.

13       Bremmer has also made some telling admissions after petitioner was convicted in 2009.

14 One of Bremmer's colleagues states in his affidavit that Bremmer once said he was the one who

15 threw Adkins into the main cabin of the boat, before quickly recanting and saying "wait, I mean

16 the other guy did it." Dkt. 39-20 at 3. Also, after Bremmer's murder of the victim in Hawaii, he

17 attempted to strangle his girlfriend with a seatbelt and clearly implicated himself in a second

18 homicide -- saying "no witnesses *this time*." Dkt. 39-19 at 4 (emphasis added).

19       Finally, Bremmer stated that he took the job with Adkins and petitioner because he was

20 attempting to save money to move to Hawaii. Dkt. 39-6 at 17. However, despite not being paid

21 after the incident (*id*. at 18), Bremmer nonetheless moved to Hawaii shortly after returning to

22 Oregon (*see* Dkt. 39-5 (interview in October, 2009, at Bremmer's Hawaii home)).

23

24

1  As noted above, the only physical evidence was blood found at the scene. The victim's

2 blood was positively identified in both the main cabin and the wheelhouse of the boat on which

3 Adkins was killed. Dkt. 47-1 at 3. Petitioner's blood was also found in the wheelhouse, but not

4 the main cabin. *Id*. Petitioner explains that the reason his blood was in the wheelhouse was

5 because he tried to stop Bremmer from beating Adkins in the wheelhouse and that Bremmer cut

6 petitioner with a knife.  According to petitioner, Bremmer then pushed Adkins into the cabin and

7 proceeded to strangle him. Dkts. 39-2 at 3; 39 at 10. Petitioner did not follow him, which would

8 provide an explanation as to why petitioner's blood was found in the wheelhouse and not in the

9 main cabin. *Id*. In fact, petitioner's explanation that he was cut by Bremmer in the wheelhouse is

10 made more credible since petitioner's blood was found in the wheelhouse, and not in the cabin

11 below.  Had petitioner actually followed Adkins into the cabin and strangled Adkins like

12 Bremmer said, then it would have been likely that petitioner's blood would have been detected in

13 the cabin, as well.  It wasn't.

14  Petitioner has also presented the testimony of an expert who opines that the blood

15 evidence at the scene is not enough to either inculpate or exonerate either individual. Dkt. 39-29.

16 The Court agrees.

17  *E.  Analysis*

18  Taking all of the evidence into account, including evidence available at the time of

19 petitioner's conviction and now, and with the benefit of the subsequent investigation and events,

20 the Court finds it more likely than not that if this matter were to proceed to trial today, no

21 reasonable juror would have found petitioner guilty beyond a reasonable doubt.

22  Therefore, petitioner is not procedurally barred from bringing the challenge to his *Alford*

23 plea and the Court may move to its merits.

24

1  **II.  Evidentiary Hearing**

2      Getting beyond the procedural bar to the petition is just the first step, however.  This

3  simply provides petitioner the opportunity to present evidence to support his petition. Curiously,

4  even though petitioner has presented a preponderance of evidence that no reasonable juror would

5  convict him that does not mean that the writ should necessarily be granted.

6      Petitioner entered into an *Alford* plea.  When agreeing to enter such a plea, a defendant is

7  not admitting that he committed the crime, but rather he admits that a jury would convict him of

8  the crime based on the evidence presented. *Alford*, 400 U.S. at 37. Theoretically, a defendant

9  could voluntarily enter into such a plea agreement even though he is "actually innocent" of the

10 crime. Such pleas provide a defendant the opportunity of a reduced charge, or a reduced

11 sentence, or both, in exchange for the defendant's willingness to forego trial. *See*, *e.g.*, *In re*

12 *Mumford*, 2011 WL 219674 at *2 (W.D. Wash. 2011) ("One of the hallmarks of an *Alford* plea is

13 the maintenance of innocence: the accused must articulate he or she is innocent of wrongdoing

14 but wishes to take advantage of a plea bargain."). A defendant accepts that bargain because it

15 may be in his best interest to avoid a longer sentence. *See*, *e.g.*, *United States v. Taylor*, 659 F.3d

16 339, 347 (4th Cir. 2011) ("An *Alford* plea is an arrangement in which a defendant maintains his

17 innocence but pleads guilty for reasons of self-interest."). Even a person who is not guilty could

18 enter into an *Alford* plea knowingly and voluntarily. *See United States v. King*, 257 F.3d 1013,

19 1022 (9th Cir. 2001) ("[A] trial court may accept a defendant's guilty plea . . . even when the

20 defendant maintains his innocence, provided the defendant clearly expresses a desire to enter the

21 plea and the record contains strong evidence of actual guilt.") (internal citations omitted); *United*

22 *States v. Matos-Quinones*, 456 F.3d 14, 21 (1st Cir. 2006) (when accepting a plea, the duty of the

23 trial court is not to determine innocence or guilt, but to determine whether the record contains

24

1   enough evidence to reasonably believe the defendant committed the crime). Therefore, additional

2   evidence is required to determine if petitioner voluntarily did so here.

3           This is also the reason why the Court need not consider further evidence related to

4   petitioner's substantive free standing claim of "actual innocence." In a sense, the issue of

5   petitioner's innocence is not relevant to whether the plea was done knowingly and voluntarily.

6   So long as there is a reasonable factual basis upon which to base the verdict, the trial court could

7   accept the plea so long as a defendant made that decision knowingly and voluntarily. *King*, 257

8   F.3d at 1022. If petitioner proves his plea was involuntary, the plea would be invalid, the Court

9   would grant the writ, petitioner's conviction would be overturned, and the Court would not

10  determine substantive actual innocence because petitioner's innocence is not truly at issue here –

11  only whether the state is holding him on a valid conviction. If petitioner fails to prove his plea

12  was involuntary, then the plea is valid and binding regardless of petitioner's innocence.

13          Also, the Supreme Court has "not resolved whether a prisoner may be entitled to habeas

14  relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383,

15  392 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993)). In fact, the Supreme Court

16  has specifically declined to resolve that issue, noting that "the threshold for any hypothetical

17  freestanding innocence claim [is] 'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 554

18  citing *Herrera*, 506 U.S. at 417. So far, the Supreme Court has not addressed that issue in the

19  context of an *Alford* plea, where defendant accepts a reduced charge in exchange for the certainty

20  of a reduced sentence, regardless of his continued assertion of his innocence.  Therefore,

21  petitioner has neither met the legal burden or the factual burden required for this Court to further

22  consider evidence regarding a substantive freestanding innocence claim.

23

24

1  The decision to hold an evidentiary hearing is committed to the Court's discretion.

2  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). As petitioner noted in his reply brief, a "habeas

3  petitioner is entitled to an evidentiary hearing if: (1) the *allegations* in his petition would, if

4  proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair

5  hearing, reliably found the relevant facts." *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir.

6  2001). Since the state court never made findings on the substance of petitioner's claim, and since

7  insufficient evidence has been submitted so far on that subject, additional evidence is required to

8  make such findings. *See* Dkt. 13, Ex. 2. At oral argument, both parties agreed that petitioner has

9  stated a claim that his *Alford* plea was coerced, but has not yet presented sufficient evidence to

10 support that assertion.

11  At oral argument, respondent argued that an evidentiary hearing was not appropriate in

12 this case because petitioner had not already presented admissible evidence to the Court. The

13 Court declines to adopt this argument. Instead, the Court relies on *Phillips*, noted above. The

14 Court concludes that, so long as petitioner has presented allegations that, if true, would entitle

15 him to relief and has provided *either* evidence on the record *or* an offer thereof, the Court has the

16 discretion to hold an evidentiary hearing. *Phillips*, 267 F.3d at 973.

17  Further, pursuant to federal and local rules, a magistrate judge who has been referred a

18 habeas petition may conduct such evidentiary hearings as are deemed necessary before

19 submitting proposed findings of fact and conclusions of law to the District Court Judge. Rules

20 Governing Habeas Corpus Cases Under Section 2254, Rule 8; MJR 4.

21  The Court also notes that petitioner has made an offer to produce evidence and his

22 allegations, if true, may entitle him to relief. Therefore, the Court finds that holding an

23 evidentiary hearing is appropriate here.

24

**CONCLUSION**

For the reasons stated above, the Court finds that, more probably than not, examining all the evidence, no reasonable juror could have found petitioner guilty beyond a reasonable doubt, and so petitioner's habeas petition is not procedurally barred. The Court also finds that an evidentiary hearing is necessary to make a finding on the merits of this habeas petition. Therefore, it is ORDERED:

1) An evidentiary hearing is scheduled for **March 8, 2018 at 9:00 a.m.** The parties are directed to appear at Courtroom D of the United States District Court at Tacoma, 1717 Pacific Avenue, Tacoma, WA 98402, at that time

2) If this date does not work for a party, the parties must confer and propose an alternative date. The parties must then notify the Court by contacting the undersigned's judicial assistant, Sandy Huntington, at sandy_huntington@wawd.uscourts.gov or by telephone at 253-882-3780.

3) The parties shall arrange for petitioner's presence.

4) At the evidentiary hearing, the Court will only entertain evidence pertaining to petitioner's claim that his *Alford* plea was coerced and therefore involuntary.

5) The parties shall submit briefs and exhibits no later than **March 1, 2018**. The briefs should address the legal issue before the Court and list the witnesses the parties will call.

6) The parties shall number all exhibits sought to be admitted and deliver a copy to chambers no later than **March 1, 2018**. Before the hearing, the parties shall confer on the admissibility of exhibits and other evidence and inform the Court which exhibits are objected to, as well as the basis for the objection. If a party will refer to portions

1      of the record that require transcription, such as the plea or sentencing hearings, those

2      portions should be obtained and submitted.

3    7) The Clerk is directed to provide a copy of this order to the parties and to the

4      Honorable Ronald B. Leighton.

5   Dated this 25th day of January, 2018.

J. Richard Creatura
United States Magistrate Judge