UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ERIN DEAN RIEMAN,

                    Petitioner,

        v.

MARGARET GILBERT,

                    Respondent.

CASE NO. 3:16-cv-05250-RBL-JRC

REPORT AND RECOMMENDATION

NOTED FOR: MAY 25, 2018

There is now sufficient reason to believe that Petitioner Erin Dean Rieman witnessed a brutal murder of his friend and partner, John Adkins, at the hands of Walter Bremmer – a man hired part time to work on their boat.  There is clear and convincing evidence that when Bremmer threatened Rieman with killing him, his girlfriend, and his family that Rieman believed him. It is therefore understandable that Rieman would plead guilty to voluntary manslaughter for a crime he didn't commit, rather than reveal what he knew and put himself and his family at risk. Under these circumstances, it cannot be said that Reiman's *Alford* plea was entered voluntarily. It is also clear that the trial court would not have accepted petitioner's guilty plea had he been

1  fully advised of the facts. Therefore, now that all of the facts have been revealed, this Court

2  recommends that petitioner's conviction be vacated and that his habeas petition be granted.

3  **FACTUAL AND PROCEDURAL SUMMARY**

4       Three men on a boat.  Adkins, Bremmer, and Rieman. They had brought the boat up from

5  Oregon to Ilwaco to repair the boat in order to get it ready for the commercial fishing season. On

6  the second night in the harbor, Adkins turned up missing.  Several months later, Bremmer, in

7  exchange for full immunity from prosecution, said that Rieman beat and strangled Adkins to

8  death. Rieman provided no explanation, other than to say that he was innocent.

9       With essentially these facts, Rieman's attorney told him that he was likely to be

10  convicted of murder in the second degree if he went to trial, facing at least 25 years and a

11  possible life sentence. Dkt. 84 at 35. Therefore, he counseled Rieman to accept an *Alford* plea to

12  a lesser charge of voluntary manslaughter, and agree to a recommended sentence of eleven years.

13  *Id.*

14       The judge who accepted the plea carefully reviewed the evidence presented and

15  questioned Rieman thoroughly as to whether his plea was being done knowingly, intelligently,

16  and voluntarily. Dkt. 13, Ex. 3 at 45-47.  Rieman assured the judge that it was. *Id*.  The trial

17  judge accepted the plea, Rieman was convicted of voluntary manslaughter, and sentenced to

18  prison for eleven years. Dkt. 13, Ex. 1.

19       That's where he stayed for the next three years – until he learned that his accuser,

20  Bremmer, had been arrested in Hawaii for strangling and shooting another man to death, in much

21  the same way as Adkins' murder was to have been committed.  For the first time, Rieman wrote

22  to the prosecuting attorney in Pacific County, explaining that it was Bremmer who murdered

23  Adkins:

24

Walter pulled a gun on me and forced me to watch as he strangled John to death[.]  Not only did Walter threaten my life if I did not support his story, and help him dispose of John[']s body but he threatened the life of my girlfriend at the time, Rachel Sachs.  He also threatened the lives of my daughter Kahau and her two children Lion and Island.  There were all born in Hawaii and currently reside there.

I took Walter[']s threats very seriously as I'd witnessed a murder. He also told me he'd killed before. . . . I have kept silent all this time to protect my family from a very real and dangerous threat.  I did so knowing full well the consequences of my silence. Wouldn't any man protect his daughter, Mr. Burke?

Ex. P1.

Rieman filed a motion to withdraw his guilty plea in Washington state court, which the court converted to a personal restraint petition.  Dkt. 13, Exs. 10, 12.  The Court of Appeals, relying on Washington law, concluded that Rieman's petition could not be granted because he waited too long to file it.

Under RCW 10.73.090(1), a collateral attack on a judgment and sentence generally is timely if filed within one year after the judgment becomes final.

. . .

Rieman's assertion that newly discovered evidence demonstrates that his plea was involuntary triggers the exception in RCW 10.73.100(1). This exception entitles a petitioner to relief if he establishes that the evidence ". . . (3) could not have been discovered before trial by the exercise of due diligence; . . ." In re Pers. Restraint of Brown, 143 Wn.2d 431, 453 (2001) (quoting State v. Williams, 96 Wn.2d 215, 222-23 (1981)).

. . .

Rieman asserts that he could not reveal the coercion and threats that led him to plead guilty until he learned of Bremmer's conviction. But this argument does not satisfy the test for newly discovered evidence because it rests on information that Rieman allegedly knew at the time of his plea; i.e., that he was being threatened by Bremmer. . . . Thus, the fact that Bremmer's conviction prompted Rieman to reveal preexisting coercion does not support Rieman's claim that newly discovered evidence shows his plea was involuntary.

Dkt. 13, Ex. 2 (parallel citations omitted).

1    The court dismissed the petition. *Id*. The Washington Supreme Court declined to review

2    his personal restraint petition. *Id*., Ex. 13.

3    Thus, he filed a petition for writ of habeas corpus in this Court. Dkts. 1, 5.

**DISCUSSION**

4

5    Unlike the Washington statute, when evaluating whether or not a petition is time barred,

6    this Court can consider any newly *presented* evidence, whether it was reasonably available at the

7    time of the plea or became available after the plea. *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir.

8    2003). This opens up an entirely new body of evidence that had not been considered by the state

9    court.

10    A federal court may grant a habeas petition either because a state court arrives at a

11    conclusion that is contrary to a decision by the Supreme Court on a question of law, or the state

12    court unreasonably applies an established legal principle to the facts of the prisoner's case. *See*

13    *Williams v. Taylor*, 529 U.S. 362 (2000). Because the state courts did not have the evidence this

14    Court has now, it is on this second basis that the Court is considering the granting of the writ.

15    Also, although our review of state court decisions under 28 U.S.C. § 2254(d)(1) is generally

16    "limited to the record that was before the state court that adjudicated the claim on the merits,"

17    *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), this limitation does not apply to claims that

18    the state court did not have an opportunity to review on their merits. *Dickens v. Ryan*, 740 F.3d

19    1302, 1320 (9th Cir. 2014). The Court may analyze evidence outside of the state court record if

20    the state court disposed of the claim based on a procedural bar, rather than on the merits. *See*

21    *Weber v. Sinclair*, 2014 WL 1671508 at *5 (W.D. Wash. 2014). Because the state court in this

22    case disposed of Rieman's claim based on a state procedural bar, by which this court is not

23

24

1   restrained, this Court has considered evidence outside the state court record to determine if

2   petitioner's claim has merit. *See* Dkt. 50.

3   **A.  Decision to Hold Evidentiary Hearing**

4   Previously, based on all the evidence produced, this Court concluded on a more probable

5   than not basis, that no reasonable juror would have found Rieman guilty of voluntary

6   manslaughter and that his petition fell within a narrow class of cases implicating a fundamental

7   miscarriage of justice.  *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). Therefore, his untimely

8   filing was excused and this Court granted an evidentiary hearing on the substantive issue of

9   whether or not the plea was voluntary.  Dkt. 50.

10  With regards to the time-bar issue, the Court incorporates that order by reference and will

11  not repeat that analysis here. Rather, this Report and Recommendation will focus exclusively on

12  the substantive claim that Rieman's plea was involuntary.

13  **B.  Standard for Involuntary Pleas**

14  In order for the plea to be involuntary, the Court must be convinced based on clear and

15  convincing evidence that, but for the alleged threats against Rieman and his family, he would not

16  have entered the plea.  *See Smith v. Mahoney*, 611 F.3d 978, 988 (9th Cir. 2010). A person can

17  voluntarily enter an *Alford* plea even if he continues to assert his own innocence. *See*, *e.g.*, *In re*

18  *Mumford*, 2011 WL 219674 at *2 (W.D. Wash. 2011) (finding that one of the hallmarks of

19  *Alford* pleas is maintaining innocence while accepting the consequences of conviction).

20  Therefore, even if Rieman was innocent, the plea is not necessarily involuntary. Nevertheless, in

21  this case, the question of who committed this crime is so intractably intertwined with the

22  voluntariness of the plea, that such evidence must be considered.  The facts presented indicate

23  that either Rieman or Bremmer committed this homicide.  If Rieman actually committed the

24

1    offense, then accepting a reduced sentence of eleven years would certainly have been a knowing,

2    intelligent, and voluntary act, since the alternative may have been a much longer sentence. And,

3    if Rieman actually committed the offense, then this latest *post hoc* explanation could simply be

4    dismissed as a misguided attempt to avoid the consequences of his decision. On the other hand, if

5    Bremmer actually committed this offense, then the voluntariness of Rieman's plea should be

6    reconsidered. If Rieman had witnessed Bremmer committing this brutal murder and was

7    repeatedly threatened by Bremmer as he claims, then it is also very likely that Rieman was truly

8    afraid for himself and his family, which makes it more probable that he would have accepted an

9    eleven year sentence rather than reveal what he knew.

10          Therefore, deciding who committed this crime – Rieman or Bremmer – is critical to the

11   question of whether the plea was voluntary.

12   **C. Rieman's Prior Statements and New Physical Evidence**

13          Accepting Rieman's new testimony is not without it pitfalls.  If the Court accepts

14   Rieman's new testimony as true, is difficult to overlook that, from the moment this murder

15   occurred and for almost three years after he was convicted, Rieman had embarked on an

16   elaborate journey of deception.  The day after the murder, he and Bremmer wandered the town

17   supposedly looking for Adkins, who they claimed had disappeared. Ex. D9 at 290-91; Ex. D11 at

18   614-15, 619. Rieman continued to construct stories for the officers and detectives assigned to the

19   case, giving detailed statements explaining that Adkins never showed up at the boat and that he

20   had no idea what happened to him.  Ex. D9 at 295; Ex. D11 at 629-30. When the officers found

21   blood on the boat, and a broken window in the wheel house, Rieman elaborated on his story by

22   explaining that an incident had occurred a few days before the night in question when the boat

23   had pitched unexpectedly and he had broken the window with his hand, bleeding on the decks.

24

1    Ex. D12 at 642, 645-46. He further testified he saw nobody else injured and did not know where

2    any additional blood could have come from. *Id*. at 647. According to Rieman's new testimony,

3    all of these statements were false.  Dkt. 84 at 56.  And, of course, if we are to believe Reiman

4    now, we must also conclude that he withheld this information from his family and attorneys,

5    despite facing a possible life sentence.  Finally, we must also conclude that he lied under oath

6    when asked by the judge during the plea colloquy whether he had been threatened in any way

7    and whether his plea was being done voluntarily.  Dkt. 13 at 45-47.

8         The Court also acknowledges that there is no new physical evidence exonerating Rieman

9    of the crime. Adkins' body was never found.  Unlike some cases where DNA evidence has

10   exonerated the accused, no such evidence has been presented here. Although the knife that

11   Bremmer used in the 2013 murder was examined for traces of Adkins's or Rieman's blood, none

12   was found, even though this evidence would have supported Rieman's new testimony. Dkt. 39,

13   Ex. 18. Bremmer remains in prison for the Hawaii murder and, so far we know, has not provided

14   further testimony regarding Adkins's disappearance.  He has not recanted his statements

15   regarding Rieman's guilt.

16        One thing is obvious. One of them is lying. Figuring out who is lying (and when) and

17   who is telling the truth (and when) requires a careful examination of the evidence.

18        Early on in this case, this Court appointed the Federal Public Defender's office to

19   represent Rieman. With the assistance of the Federal Public Defender's office, and the able

20   advocacy of the State Attorney General's office, the Court has attempted to piece together

21   evidence both before, during, and after the events in question to put contours on the untold story

22   of this case.

23

24

REPORT AND RECOMMENDATION - 7

Both parties have been very well represented. And, the Federal Public Defender's office, and particularly First Assistant United States Attorney Miriam Schwarz, Assistant United States Attorney Alan Zarky, and Investigator Mike Stortini are to be specially commended for their remarkable job of gathering and presenting additional evidence and unraveling each version of events presented to the trial court and this Court. Their work now provides additional illumination on what actually happened the night Adkins was killed.

**D. Prior Incidents of Strangulation by Bremmer**

Both Bremmer and Rieman state that the other killed Adkins by way of strangulation. Ex. P3 at 1189; Dkt. 84 at 8-10. This is a particularly heinous act. Not everyone is capable of performing such an act and statistics demonstrate that male death by strangulation is extremely rare. Dkt. 39-14 at 3. Therefore, it is noteworthy that Rieman has no history of committing acts of strangulation. In fact, Rieman has no history of *any* violent crimes. *See* Dkt. 13, Ex. 1 at 2.

Bremmer, on the other hand, has a substantial history of violence, and specifically, strangulation – both before and after the events of the night in question. As discussed in the Court's previous order, now before the Court are affidavits demonstrating that Bremmer attempted to strangle at least three people before Adkins was killed and at least two more subsequent to the Adkins homicide. *See* Dkt. 50 at 9-12.

> That investigation revealed that one of Bremmer's previous girlfriends states that before the Adkins homicide, Bremmer had assaulted and attempted to manually choke her. Dkt. 39-22 at 3. Also, another woman has submitted a statement that Bremmer had raped her and that during that event, Bremmer used his hands to grasp her neck. Dkt. 39-23 at 2-3. In addition, his ex-wife has submitted a statement that Bremmer had also choked her on one occasion. Dkt. 39-24 at 3. All of these incidents had occurred before the Adkins homicide.
>
> In 2012, after the Adkins homicide, Bremmer was arrested and pled guilty to a shooting and strangulation death in Hawaii. His girlfriend at the time stated that she had witnessed the aftermath of the 2012 murder and, in the days after, Bremmer also strangled her with a seatbelt, saying "no witnesses this time." Dkt. 39-19 at 4.

*Id.* at 9.

An investigator for petitioner, Mike Stortini, interviewed one of Bremmer's cellmates at Sauaro Correctional Center, where Bremmer is serving his state sentence for murder. This cellmate stated to the investigator that Bremmer had talked about the many fights he had been in and even demonstrated his "go to move", where he places both hands around another person's neck and chokes him. Dkt. 39-21, Ex. 22.

The same investigator even interviewed Bremmer's own brother, John Bremmer, who stated that his younger brother was, among other things, a "pathological liar since childhood", who would torture and kill dogs and cats. Dkt. 39-27, Ex. 28. He believed that his brother "has killed wherever he lived." *Id.* Of course, these statements are of limited value because they are hearsay and not subject to cross examination. Nevertheless, when one's own brother can make these statements, it certainly calls into question who should be believed in this case and who was capable of performing such a violent crime.

Generally, evidence of a person's character trait is not admissible to prove that on a particular occasion the person acted in accordance with that character trait. Fed. R. Evid. 404. Interestingly, in a criminal case, a defendant may offer evidence of the defendant's pertinent trait, which may be rebutted by the prosecutor. Fed. R. Evid. 404(2)(a). There is also the doctrine of "*modus operardi,*" which as explained in this Court's previous order, allows evidence of past conduct if it is "similar enough" to be probative on the issue of guilt. *See United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997); *see also United States v. Torrez*, 869 F.3d 291, 301-02 (4th Cir. 2017) (finding prior assaults against women involving sexual violence and strangulation as sufficiently similar for admission); *U.S. v. Sablan*, 2008 WL 700172 at *14 (D. Col. 2008) (finding a past assault was "similar enough" to a present assault because it appears to

1    show defendant was the aggressor); Dkt. 50 at 10. All of this evidence is "similar enough" to be

2    probative as to who actually committed this offense.

3         Rieman's testimony with regard to Bremmer's assault on the night in question is

4    completely consistent with Bremmer's documented acts of violence.  He testified:

5         A.  I had been awakened early – earlier in the evening by some loud noises, and I went to
          investigate. This is on the boat. John was sitting in the wheelhouse of the boat, and
6         Bremmer was standing over him. And it looked to me like John had been beat up a bit.
          Walter Bremmer had a knife in his hand. He and I got into a pretty vigorous fight, where
7         I tried to wrestle the knife that he had away from him. And I did that.

8         Q.  You and Bremmer, you said, got into a fight?

9         A.  Yes. I got Bremmer to leave the wheelhouse of the boat, and I sat down next to John
          in the wheelhouse. John and I talked briefly. John just told me that he needed Walter
10        Bremmer to leave the boat. In a couple of minutes, perhaps, John got up and started
          walking towards the stairwell, going into the salon of the boat, out of the wheelhouse. I
11        think he got pulled down into the wheelhouse. I heard a pretty loud sound like a punch or
          a kick. And I got up and walked down into the steps. I got on the steps going into the
12        wheelhouse of the boat. Bremmer was there, standing over John, and he had a gun in his
          hand. That's when he pointed it at me. And so I stopped at the stair of the wheelhouse.
13        Bremmer took a power cord from my pile of tools and he wrapped it around John's neck,
          and he stepped on one end and bent down and pulled on it and choked John.

14
          Q.  Did Bremmer say anything?
15
          A.  The only thing Bremmer ever said during that evening, that I remember him saying,
16        was that he wasn't going to jail again.

17        Q.  You said you actually saw Bremmer pull this cord around John's neck?

18        A.  Yes.

19        Q.  Is there anything more you can remember about his demeanor as he was doing this?

20        A.  Walter Bremmer enjoyed killing John.

21        Q.  Why do you say that?

22        A.  The look in his face. He had an erection as he was standing there. He enjoyed
          killing John.

23
     Dkt. 84 at 8-9.
24

1    Rieman went on to testify that he viewed pictures of the victim Bremmer killed a few

2    years later in Hawaii, with a cord wrapped around his neck, and he testified that it was very

3    similar to how Bremmer strangled Adkins. *Id.* at 10. Both cases involved a knife (Dkt. 39-13,

4    Ex. 14) and a gun, in addition to the cord. Dkts. 39-11, Ex. 12; 39-12, Ex. 13; 39-13, Ex. 14.  In

5    both cases, Bremmer used bleach to clean the scene, washing blood off of his body and clothing

6    in Hawaii just as Bremmer told detectives he had cleaned up the boat with bleach to wash away

7    the evidence after Adkin's homicide. *Compare* Dkt. 39-11, Ex. 12 at 4 *with* Dkt. 39-6, Ex. 6 at

8    13.

9    And, in both cases Bremmer made death threats to witnesses that could incriminate him.

10   In the Hawaii case, Bremmer showed up at his girlfriend's house covered in blood.  Dkt. 39-11,

11   Ex. 12 at 4-5. He was intoxicated and described killing Johnny Leong, by shooting him and then

12   returning to the house later and strangling him with a cord. *Id*. She didn't tell investigators what

13   she knew because she was afraid Bremmer would kill her. He eventually also attempted to kill

14   her, and began choking her making some remark about "no witnesses." She escaped and

15   eventually told police.  Dkt. 39-11, Ex. 12, at 2-6.

16   Suffice it to say, after hearing the additional evidence and Rieman's testimony, this Court

17   is even more persuaded that between the two of them, based on Bremmer's extensive history of

18   violence – especially, assaults by strangulation – Bremmer is substantially more likely to be the

19   one who committed this homicide, and not Rieman.

20   **E.  Bremmer's statements.**

21   It should first be noted that Bremmer – like Rieman – initially told investigators that he

22   had no idea what happened to Adkins.  Two days after the homicide, Bremmer told Deputy

23   Sheriff Michael Hanratty that he had left Adkins at the Sea Hag Bar late in the evening, after

24

1    both of them had been doing a lot of drinking. Dkt. 39-4, Ex. 3. Adkins was very drunk. When

2    Bremmer returned to the boat, Rieman was asleep. *Id*. When they got up in the morning, Adkins

3    wasn't there.  End of story. Dkt. 39-1, Ex. 5, p. 14-15.

4         Several months later, after Bremmer had moved to Hawaii, and in exchange for complete

5    immunity, Bremmer gave a completely different story. *See* Dkt. 39-6, Ex. 6; Ex. P3.   By this

6    time, investigators had found evidence of blood on the boat.  Ex. D12 (interview on July 11,

7    2009, indicating police had discovered blood evidence); Dkt. 39-6, Ex. 6 and Ex. P3 (Bremmer

8    interview on October 19, 2009).  The investigation was narrowing in on either Rieman or

9    Bremmer, or both of them, as possible suspects. In an expletive-filled recitation of the events,

10   Bremmer changed his story entirely and stated that he had been locked in the Harbor Lights bar

11   all evening, even after it closed, and that he had returned to the boat during hours of darkness.

12   Dkt. 39-6, Ex. 6 at 4; Ex. P3 at 1188. As he approached the boat, he described viewing a bloody

13   fight between Rieman and Adkins through a window.  *Id*. at Dkt. 39-6, Ex.6 at 5; Ex. P3 at 1189.

14   He watched Rieman beat and strangle Adkins with a cord down in the hold of the boat.  Dkt. 39-

15   6, Ex. 6 at 8-9; Ex. P3 at 1192-93.  Rieman purportedly threatened Bremmer and Bremmer's

16   girlfriend if he said anything. *Id.*

17        Subsequent evidence not presented to the trial court reveals many inconsistencies in

18   Bremmer's second version of the facts.  First, two witnesses who worked at Harbor Lights stated

19   that Bremmer was not present at Harbor Lights that evening. Dkt. 42, Ex. 7; Dkt. 39-8, Ex. 8 at

20   2-3. No one remained in the bar after it closed. *Id.* Because of the safety doors installed at the

21   restaurant, it would be impossible for anyone to be locked in. *Id.*

22        Also, security video of the dock reveals that Bremmer returned to the dock before Harbor

23   Lights closed – at approximately 8:05 p.m. (Dkt. 39, Ex. 4), directly contradicting Bremmer's

24

REPORT AND RECOMMENDATION - 12

statement. Finally, counsel for petitioner retained a Crime Scene Reconstructionist, Matthew

Noedel, who attempted to determine the lines of sight from the dock from where Bremmer

claimed to have first witnessed Rieman and Adkins fighting. He could not identify any possible

location where that could have occurred.  Dkt. 39-29, Ex. 30 at 3.

Also, when investigators were interviewing Bremmer the second time, they were

interested in finding any other evidence of the crime. Initially, Bremmer said that "[e]verything

went overboard" Dkt. 39-6, Ex. 6 at 14; Ex. P3 at 1198. When pressed, however, whether

anything was thrown into a garbage can at the top of the pier, he claimed "[t]hat wasn't me." *Id.*

Q. What about a yellow rain jacket?

A. I don't know anything about a yellow rain jacket unless he was wearing it, but maybe
– no, I don't know.

*Id.*

Security video reveals Bremmer disposing of a yellow rain jacket in the dumpster near

the boat after the evening Adkins disappeared. Dkt. 39, Ex. 10. As stated by petitioner's counsel,

"[t]his destruction of apparent evidence, together with his false denial of that act, is both

devastating to Bremmer's credibility and indicative of his guilt." Dkt. 39 at 14. The Court agrees.

In fact, Rieman's counsel has submitted evidence of several occasions when Bremmer

admitted to other persons that he had committed murders.  His girlfriend in Hawaii, his brother,

and Rieman have all stated that at one time or another Bremmer had confessed to killing on more

than one occasion. *See* Dkt. 39-11, Ex. 12; 39-26, Ex. 27; Dkt. 84 at 12.

Bremmer's own statements have often been self-incriminating – both in his telling

admissions and with his blatant lies. While the Court has not had the opportunity to observe

Bremmer's demeanor directly, the evidence submitted regarding his lack of credibility and his

capacity for violence is clear and convincing.

1    **F.  Motive**

2         Violent acts are often fueled by excessive alcohol. Sometimes, when people drink in excess,

3    it takes little motivation to engage in terrible acts. All three of them – Adkins, Bremmer, and

4    Rieman – drank to excess regularly. Rieman and Adkins were friends. They would drink

5    together. Rieman admitted that Adkins could often become unruly when he drank and that he

6    (Rieman) would sometimes have to pull Adkins out of the situation. Ex. D9 at 289.[1] Rieman was

7    a drinker, as well, admitting that both he and his girlfriend at the time had alcohol problems.

8    Dkt. 84 at 93. And, of course, as previously documented, Bremmer was repeatedly drunk.

9         Tellingly, however, there is no evidence that Rieman drank in excess on the night in

10    question.  He testified – and it is uncontradicted – that he stayed on board the boat that night.

11    Dkt. 84 at 7-8. He and Adkins were partners in the boat, but Rieman was the one who was

12    familiar with the work that had to be done and was in charge of the repairs that were to begin the

13    next day.  Dkt. 84 at 16; Ex. D9 at 289. So, he stayed on the boat and wanted to get some sleep

14    so that he was prepared for the next day. *Id*. There is no evidence that Rieman got drunk that

15    night.

16         It is also uncontradicted that both Adkins and Bremmer went ashore and did get drunk

17    that night. Dkt. 39-4, Ex. 3. So, it is fair to conclude that on the night Adkins was killed, both

18    Adkins and Bremmer were drunk, but Rieman was not.

19         Alcohol affects people in different ways.  From all indications, generally, Adkins got

20    unruly, Rieman was the peace keeper, and Bremmer got violent. For what it's worth, this fits

21    Rieman's description of the events, and not Bremmer's. The evidence indicates that Bremmer

22

23    _____
      [1] The Court acknowledges that this assertion is contained in Rieman's original, now discredited, statement
24    to police. However, because neither party challenges the assertion, the Court gives his uncontradicted statements to
      police the weight they are owed.

1    was capable of violent acts when he was drunk. Even murder. Therefore, it is certainly possible

2    that Adkins got obnoxious, Bremmer got violent, and the two of them got into a fight, as Reiman

3    testified.  Rieman attempted to come between them, and was cut in the process.

4        There was no other evidence of motive.

5        Reiman had no reason to kill Adkins. They were friends and partners. There is no

6    evidence that Rieman and Adkins ever argued. They were bringing the boat to Ilwaco so that

7    they could make repairs and continue their fishing business. Dkt. 84 at 15. Rieman had no

8    money. Adkins did. This fishing boat was Rieman's best chance to make a financial go of it. *Id.*

9    at 15-17. Rieman had always dreamed of working his own fishing boat, but could never afford it.

10   Adkins bought the boat and had agreed that Rieman would contribute his labor and experience to

11   buy into it when the boat was operating. *Id*. Adkins was going to pay for the repairs. *See id*. And

12   Rieman was sober that night. Therefore, what motivation did Rieman have to kill his partner?

13   None was provided to the trial court, nor to this court. The absence of a motive by Rieman

14   supports a finding that he was not the one who killed Adkins.

15   **G. Blood Evidence**

16       Probably the primary reason a missing person's investigation became a homicide

17   investigation was the discovery of blood on the boat and evidence that bleach had been used in

18   an apparent attempt to remove it.  *See* D12 at 642, 646 (police interview mentioning blood and

19   attempted cleanup); Dkt. 39-6, Ex. 6 at 28 (Bremmer describing using bleach to clean up blood).

20       Adkin's blood was located in the wheelhouse and below deck.  Dkt. 39-29, Ex. 30 at 4;

21   Dkt. 47-1, Ex. 33. Rieman's blood was located only in the wheelhouse, and not below deck. *Id.*

22   The presence and location of blood is consistent with both Rieman's and Bremmer's statements

23   and testimony. Bremmer claims that when he first viewed Rieman and Adkins fighting, they

24

1   were both bloody, though Rieman less so than Adkins. P3 at 1194; Dkt. 39-6, Ex. 6 at 10.

2   Rieman states that when he first came upon Adkins and Bremmer in the wheelhouse, Bremmer

3   had a knife. Dkt. 84 at 8. When Rieman attempted in intervene, Bremmer cut Rieman's hand. *Id.*

4   at 73. Again, this would explain why Rieman's blood was in the wheelhouse and not below deck.

5          The Court finds the evidence of blood on the boat and its location is not conclusive of

6   anything. Dkt. 39-29, Ex. 30. And, if anything, the Court agrees with the forensic expert,

7   Matthew Nodel, that the absence of Bremmer's blood at the scene does not mean that Bremmer

8   did not commit the homicide. Dkt 39-29, Ex. 30. As he pointed out, "absence of evidence is not

9   evidence of absence." *Id.* It is entirely possible that Bremmer came out of this fight without

10  shedding his own blood. And it is also entirely possible that once Rieman had been cut by

11  Bremmer in the wheelhouse, he was reluctant to stop Bremmer's subsequent assault on Adkins

12  below deck, accounting for the absence of Rieman's blood in that location.

13         In an effort to locate further evidence of Adkins' or Rieman's DNA connecting Bremmer

14  to the homicide, Rieman's lawyers sought and obtained permission to conduct additional DNA

15  testing on Bremmer's knife, which was found at the murder scene in Hawaii. Dkts. 22, 34.  It is

16  not surprising that this effort was unsuccessful since it was conducted long after the 2009

17  homicide and there is no direct connection between this knife and the knife that Rieman claims

18  Bremmer used on the night of Adkin's death. *See* Dkt. 39 at 17, n. 7.

19         All in all, the Court draws no conclusions from the blood evidence discovered after the

20  homicide, other than that it demonstrates that something untoward happened on that boat,

21  leading to Adkin's death.

22

23

24

1    Suffice it to say, after hearing the additional evidence and Rieman's testimony, this Court

2    is even more persuaded that Bremmer actually committed this crime – not Rieman. Between the

3    two of them, Bremmer is substantially more likely to be the one who committed this homicide.

4    **H. Voluntariness of the *Alford* Plea.**

5    As the Court noted at the evidentiary hearing, while the question of who actually killed

6    Adkins may be relevant, the only issue to be determined here is whether petitioner's *Alford* plea

7    was entered voluntarily. A guilty plea, even an *Alford* plea in which the defendant maintains his

8    innocence, is only valid if it "represents a voluntary and intelligent choice among the alternative

9    courses of action open to the defendant." *Smith v. Mahoney*, 611 F.3d 978, 988 (9th Cir. 2010)

10   (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). "A guilty plea, if induced by

11   promises or threats which deprive it of the character of a voluntary act, is void." *Chizen v.*

12   *Hunter*, 809 F.2d 560, 561 (9th Cir. 1986) (quoting *Machibroda v. United States*, 368 U.S. 487,

13   493 (1962)). "[T]he 'voluntariness' of a plea turns on the extent to which a defendant is

14   permitted to make a *free choice* among the acceptable alternatives available at the plea stage."

15   *United States v. Hernandez*, 203 F.3d 614, 618 n.5 (9th Cir. 2000) (emphasis in original),

16   *overruled on other grounds by Indiana v. Edwards*, 554 U.S. 164 (2008).

17   A plea is not voluntary if it is the result of a real or perceived threat, inducing the

18   defendant to plead guilty.  *Chizen*, 809 F.2d at 561.  The threat or coercion need not come from a

19   state actor. The "coercion by non-attorney third parties can render pleas involuntary." *Iaea v.*

20   *Sunn*, 800 F.2d 861, 867 (9th Cir. 1986). The Ninth Circuit used the example of an invalid guilty

21   plea when "a third party has threatened to murder [the defendant's] spouse if he does not plead

22   guilty." *Id*. Though no cases in either the Ninth Circuit or other circuits have found coercion

23

24

1  from a third party, neither do they "preclude[] the possibility of such a finding in an appropriate

2  case." *Id*.

3          When examining the voluntariness of a plea, the Court must take into account all the

4  circumstances surrounding the plea. *Brady*, 397 U.S. at 749. "The voluntariness of a guilty plea

5  is a question of law not subject to deferential review." *Iaea*, 800 F.2d at 864.

6          Rieman's testimony is that during and after witnessing Bremmer's brutal murder of

7  Adkin's, Bremmer made numerous threats. "Throughout the night, a couple of times while I was

8  in the foscle, he made it clear if I told anybody what happened that he would kill me or Rachel

9  [petitioner's girlfriend at the time]." Dkt. 84 at 10. He said "he had killed 22 people" and carried

10  a gun with him the next day as petitioner and Bremmer walked through town. *Id*. at 11-12. On

11  the boat ride home, Bremmer literally held a gun to Rieman's head during two phone calls,

12  ensuring that Rieman did not implicate him or otherwise tell anybody that Adkins had been

13  murdered. *Id*. at 11-12. Bremmer lived only 60 feet away from Rieman and Rieman's girlfriend

14  (*Id*. at 13), continued to threaten Rieman, and maintained a persistent presence near Rieman's

15  home (*Id*. at 15, 19, 79). He entered Rieman's house on one occasion, when no one else was

16  home, and viewed pictures of Rieman's family who lived in Hawaii.  *Id*. at 21-22. Nine days

17  after the murder, Bremmer moved to Hawaii, indicating beforehand that he knew where

18  Rieman's family was, and that he would harm them if Rieman implicated him, even calling

19  Rieman with additional threats when police interviewed him once he had moved. *Id*. at 22-25.

20          Because the Court concludes that Bremmer committed the crime, it also follows that

21  Rieman's account of Bremmer's threats are true. And, since Rieman witnessed Bremmer's

22  brutality and capacity for violence, it is reasonable to conclude that Rieman had a real belief that

23  Bremmer would carry through with those threats if Rieman revealed what he saw.

24

REPORT AND RECOMMENDATION - 18

1    All of this was in petitioner's mind throughout the investigation, after he was arrested,

2  charged with murder, and began contemplating trial. He continued to navigate the task of

3  maintaining his own innocence, yet ensuring that he did not implicate Bremmer. *Id*. at 31. His

4  efforts to cover up what happened, yet continue to maintain his own innocence, caused a number

5  of problems.

6    Rieman "stonewalled" his attorneys.  He provided no account of the events, "other than,

7  'I didn't kill John.'" *Id*. at 33. And he continued to avoid implicating Bremmer. *Id*. at 33.

8  Rieman states that he feared divulging what he knew to his attorney because he had given his

9  attorney permission to talk with his family and did not want to risk his family being harmed if

10  they were informed of the true events and told anybody else. *Id*. at 33.

11    During the evidentiary hearing conducted by this Court, on cross-examination,

12  respondent asked Rieman why he didn't tell police – or his counsel, with whom he has an

13  attorney-client privilege – about the incident, trusting the system to arrest and charge Bremmer.

14  *Id*. at 57-58, 62-63. Rieman claims that he did not believe that the police would have

15  immediately arrested Bremmer, but that they would more likely ask Bremmer about his

16  statements. *Id*. at 58, 76. He believed that the police would attempt to investigate by divulging

17  his statement to Bremmer, giving Bremmer the opportunity to follow through with his threats

18  and leading to the exact circumstance petitioner was trying to avoid. *Id*. at 74.

19    Two of petitioner's attorneys first explained to him that he could be facing substantial

20  prison time and that Washington still had the death penalty in place. *Id*. at 27, 30. Petitioner was

21  ultimately charged with murder in the second degree.  His trial attorney in Washington provided

22  him information about the sentencing ranges, indicating that, if convicted at trial of second

23  degree murder, he could face 25 years in prison to life. *Id*. at 32. Further, petitioner's attorney

24

1    advised him that in the absence of any other explanation as to how Adkins was killed, he

2    believed there was a strong likelihood petitioner would be convicted if he went to trial. Rieman's

3    attorney advised him that "without a defense, . . . unless Bremmer's plane crashed into the

4    Pacific, I was going to go to prison." *Id*. at 33-34.

5         Petitioner thus believed he had two options: 1) go to trial, and almost certainly be

6    convicted, spending at least several decades in prison; or 2) take a plea to the lesser offense of

7    voluntary manslaughter and spend eleven years in prison for a crime he didn't commit. *Id*. at 35.

8         He states that, though he had a moral problem lying to the Court, the specter of

9    Bremmer's threats and his family believing he was a murderer if he was convicted by a jury,

10   swayed him. *Id*. at 60.

11        The Court notes that others may have taken a different path, trusting that the authorities

12   and the courts would protect his family and not wrongfully convict him. And the Court does not

13   countenance petitioner's admitted deception, especially his lying under oath. However, this is

14   about the circumstances surrounding Rieman's plea, and both Rieman's state of mind and the

15   perception of his options are circumstances that must be accounted for and acknowledged to

16   determine if his plea was voluntary.

17        With all the evidence presented, and in light of his conflicting statements, the Court must

18   consider Rieman's character and credibility and determine which version of the events is correct.

19   The Court believes that there is clear and convincing evidence that his most recent version is the

20   most likely scenario of the actual events.

21        Among other things, the Court considered the sworn affidavit of Robert Augustus, with

22   whom Rieman first shared his secret. Mr. Augustus is a private construction contractor who

23   performs work at the prison and who has had no connection with the case until his affidavit was

24

REPORT AND RECOMMENDATION - 20

1   submitted. He had worked with Rieman at the prison for several years, developing a friendship

2   and a confidence between the two of them. He states, in pertinent part:

3         I always found Erin to be an interesting situation. He never seemed like any of the
          other inmates, in fact, I found it hard to believe he was doing time in prison. Erin,
4         for the most part, kept very quiet about his case and just did his work. He began to
          confide in me about 6-8 weeks after he began working for me in June of 2012. . . .
5         Erin told me he was on a boat and one of the deckhands killed someone on the
          boat. Erin told me he did not do it, yet he felt very remorseful for not being able to
6         prevent the killing. Erin said he didn't do enough to stop it. He said at that
          moment he also feared for his own life. Erin said he 'did an Alford plea' because
7         he was afraid of doing a very long prison sentence.

8         Erin also confided in me, about 6-8 weeks after he began working for me in June
          of 2012, that the person that did the killing on the boat threatened Erin's life, and
9         the lives of Erin's family members in Hawaii. Erin said he was threatened to keep
          quiet, and if Erin said anything against the killer, the killer would murder Erin's
10        family in Hawaii.

11        Erin said he couldn't jeopardize his family and he felt the Alford plea was
          consciously the right thing to do.
12
          When Erin first told me about the threats made by the killer, Erin had not yet
13        learned of the murder in Hawaii. . . .

14  Ex. P12 at 2-3.

15        The Court finds that petitioner has presented clear and convincing evidence that Bremmer

16  was the person who murdered Adkins, that Bremmer subsequently threatened petitioner with

17  harm to him, his girlfriend, and his family if he implicated Bremmer, that petitioner therefore

18  kept the actual events secret, and that but for this threat, petitioner would not have entered his

19  *Alford* plea. This Court is persuaded that if the trial court had all of the information that is before

20  this Court, it would not have accepted petitioner's plea as being entered voluntarily. The Court

21  thus finds that petitioner's *Alford* plea is void.

22        Therefore, the Court recommends that petitioner's conviction be vacated, that

23  petitioner's habeas petition be granted, and that a writ of habeas corpus be issued.

24

REPORT AND RECOMMENDATION - 21

1    Petitioner has also filed a supplemental memorandum explaining his desired remedy.

2    Dkt. 85. Respondent has filed a reply to this memorandum. Dkt. 86. Along with immediate

3    release, petitioner requests that the Court order the state to allow him to withdraw his guilty plea,

4    expunge his record, and order the state to refrain from charging petitioner with the death of

5    Adkins. Dkt. 85. In support, petitioner cites to *Morales v. Portuodo*, 165 F. Supp. 2d 601

6    (S.D.N.Y. 2001). However, even that case acknowledged that "[u]nconditional release . . . is a

7    remedy rarely granted." *Id*. at 608. As respondent correctly notes, barring retrial in successful

8    habeas petitions is limited to "only the rarest of circumstances." *Id*. at 609. Further, the Court has

9    "broad discretion in conditioning a judgment granting habeas relief." *Loher v. Thomas*, 825 F.3d

10   1103, 1121-22 (9th Cir. 2016). In its discretion, the Court may condition petitioner's release on

11   the action or inaction of the State.

12    Here, petitioner's case has been the subject of judicial scrutiny by a number of courts.

13   There is no question that each court attempted to do what is just – as has this Court.  But the

14   unique circumstances of this case make it particularly appropriate that both sides retain the

15   ability to complete the judicial process.  Therefore, the *Morales* case is distinguishable.  In

16   *Morales*, petitioners were convicted because the prosecutor's office used its power in an

17   unreasonable manner. *See* 165 F. Supp. 2d at 612-14. With this in mind, the New York District

18   Court ultimately found that the petitioner's case had been so prejudiced that it would be unjust to

19   condition his release from prison. *Id*. at 609-12. Here, there is no record of prosecutorial

20   misconduct or procedural prejudice.  Further, although he did not admit guilt and although under

21   duress, petitioner did accept an *Alford* plea, acknowledging that he believed the state had enough

22   evidence to convict him. Thus, this case is distinguishable from *Morales*, and does not present

23   the same compelling circumstances requiring immediate relief.

24

1      Therefore, the Court declines to recommend petitioner's suggested remedy. Instead, the

2  Court recommends that the District Court order respondent to release petitioner within 30 days of

3  granting the petition; the order of release should be stayed pending any appeal to the Ninth

4  Circuit that may be filed by either party.

5                 **CERTIFICATE OF APPEALABILITY**

6      Petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

7  court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

8  (COA) from a district or circuit judge. A certificate of appealability may issue only if petitioner

9  has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. §

10  2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could

11  disagree with the district court's resolution of his constitutional claims or that jurists could

12  conclude the issues presented are adequate to deserve encouragement to proceed further."

13  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473, 484

14  (2000)). Pursuant to this standard, this Court concludes that petitioner is entitled to a certificate

15  of appealability with respect to this petition, and recommends the District Court issue such a

16  certificate.

17                        **CONCLUSION**

18      Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

19  fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

20  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

21  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

22  of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

23  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

24

1    imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on **May**

2    **25, 2018** as noted in the caption.

3    　　　　Dated this 30th day of April, 2018.

4

5    　　　　　　　　　　　　　　　　　　　J. Richard Creatura

6    　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 24