HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ERIN DEAN RIEMAN,

          Petitioner,

   v.

MARGARET GILBERT,

          Respondent.

CASE NO. 3:16-cv-05250-RBL

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

**INTRODUCTION**

THIS MATTER is before the Court on Erin Dean Rieman's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. Dkt. #5. Magistrate Judge J. Richard Creatura recommends that the Court grant Rieman's Petition. Dkt. #87. The State has filed objections. Dkt. #96.

In 2010, Rieman pled to manslaughter in the first degree for the death of John Adkins. Rieman now claims that he is innocent and that his plea was coerced by threats from the true murderer, Walter Bremmer. Rieman supports his claims with his own new testimony about what happened on the night of the murder and evidence of Bremmer's pattern of violent behavior. But Rieman's belated testimony is not enough to clear the high hurdle to demonstrating actual

innocence, nor does he present sufficient evidence that his plea was involuntary. The Court therefore DENIES Rieman's Petition.

## FACTUAL BACKGROUND

On the afternoon of Saturday, July 4, 2009, Erin Rieman, John Adkins, and Walter Bremmer docked their fishing boat at the port of Ilwaco, Washington. Rieman and Adkins owned a fishing company together, while Bremmer had been hired a few days earlier to work as a deckhand. The plan was to haul the boat (named "the Tiger") out of the water on Monday to make repairs, but the three men had some free time before that and spent Saturday evening watching fireworks and drinking beer.

The next day, Adkins and Bremmer set out early to drink at bars while Rieman stayed on the boat to prepare for the haul-out. Adkins and Bremmer came back a few times but spent most of the day in town. It is uncertain what time they returned to the Tiger that night or what happened when they got there. It is certain, however, that John Adkins was missing the next day. His body was never recovered.

Rieman and Bremmer spent Monday walking around the docks of Ilwaco asking if anyone had seen Adkins. When they could not locate him after a few days, the two men took the boat back to Oregon, where they lived in the same trailer park. Adkins's family notified authorities of his disappearance and the police interviewed Rieman and Bremmer, who both denied knowledge of Adkins's whereabouts.

However, after about a week, Bremmer left Oregon and moved to Hawaii, where he was interviewed by police again. This time, Bremmer's story changed. In exchange for immunity, Bremmer told police that he witnessed Rieman brutally murder Adkins on the night of July 5. According to Bremmer, Rieman fought violently with Adkins aboard the Tiger, putting his head

through the side window and finally strangling Adkins with an extension cord. Bremmer went on to explain that Rieman threatened to kill Bremmer and his girlfriend unless he helped clean the boat out with bleach, pretend to look for Adkins, and dispose of the body at sea.

Because this story fit with the discovery of Rieman's and Adkins's blood on the Tiger near the broken window, Rieman was arrested. Rieman remained in custody for a while awaiting trial. However, rather than risk a long sentence, Rieman ultimately pled guilty to first degree manslaughter with a sentence of 11 years.

Rieman remained in prison for two years without taking any further action. But in 2012, Bremmer was convicted of murder in Hawaii. This prompted Rieman to write a letter to the prosecutor in his case. Rieman stated in the letter that he had withheld the truth about Adkins's murder since 2009 because of threats from Bremmer, but now felt that he could reveal his story safely because of Bremmer's incarceration. This theory forms the basis of Rieman's habeas petition.

**PROCEDURAL BACKGROUND**

Rieman first sought post-conviction relief in state court. Dkt. #13, Exs. 10, 12. However, because Washington's one-year statute of limitations had expired, Rieman had to qualify for an exception in order to present his claim. Dkt. #13, Ex. 2. The state court of appeals found that Rieman did not satisfy the exception because his new evidence could have been "discovered before trial by the exercise of due diligence." *Id.* (quoting *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453 (2001)). Rieman appealed the dismissal of his petition, but the Washington Supreme Court declined review. Dkt. #13, Ex. 13.

After being turned away from state court, Rieman petitioned for a writ of habeas corpus at the federal level under 28 U.S.C. § 2254, and this Court referred the matter to Magistrate

Judge J. Richard Creatura. On January 25, 2018, Judge Creatura issued an order calling for an evidentiary hearing to address Rieman's claim that he entered his plea involuntarily. Dkt. #50. The order also set forth the court's finding that Rieman passed through the "actual innocence procedural gateway," allowing him to avoid default and present his substantive claim. *See Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). The State objected to the order, Dkt. #51, but this Court declined to interfere with the proceedings until Judge Creatura issued a full Report and Recommendation. Dkt. #64; *see* 28 U.S.C.A. § 636(b)(1).

On April 5, 2018, Judge Creatura conducted an evidentiary hearing, Dkt. #83, and subsequently issued a Report and Recommendation that this Court grant Rieman's Petition for Habeas Corpus. Dkt. #87. The State again objected. Dkt. #96. Due to the substantial credibility issues in the case, this Court conducted an additional evidentiary hearing starting on September 5, 2018 at which more witnesses testified, including Rieman and Bremmer. Dkt. #129, 130, & 133. Both sides were well-represented, and Rieman's counsel in particular made an outstanding effort and compiled an extensive set of supporting documents.

Before the Court could rule, however, Rieman moved to stay proceedings so he could investigate whether Bremmer was responsible for several additional murders. Basically, it was Rieman's theory that strangling is Bremmer's modus operandi and that he may have committed several unsolved strangulations around the country that line up with his whereabouts over the decades. Rieman's request for a one-month stay was followed by several more and, before long, Rieman was released from prison in September of 2019. Despite Rieman's release, this case remained stayed until the Court requested a status report on April 9, 2020. Rieman reported that his investigatory efforts had come up short but renewed his request for habeas relief. After this lengthy intermission, the Court will now finally address the merits of Rieman's Petition.

**DISCUSSION**

For Rieman's Petition to succeed, the Court must rule in his favor twice. First, because Rieman defaulted on his substantive claim,[1] he must pass through the procedural "gateway" by proving his actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995). After clearing this demanding hurdle, Rieman must then successfully demonstrate that his plea was involuntary. *See Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007). Because Rieman took an *Alford* plea, which did not require him to admit guilt, proving innocence does not guarantee that Rieman's involuntary plea claim will succeed as well. *See In re Mumford*, No. ADV 10-01078-KAO, 2011 WL 219674, at *2 (W.D. Wash. Jan. 24, 2011) ("One of the hallmarks of an *Alford* plea is the maintenance of innocence."). Conversely, Rieman's failure to prove actual innocence would technically end the inquiry. However, because the evidence and arguments about innocence and involuntariness are inextricably linked, the Court will analyze both the procedural and substantive aspects of Rieman's Petition.

**A.    Actual Innocence Procedural Gateway**

When a habeas petitioner under § 2254 has procedurally defaulted on their constitutional claim, they may not present the claim in federal court unless "(1) 'cause and prejudice' excuse the default, or (2) the dismissal of [the] appeal would produce 'a miscarriage of justice.'" *Griffin v. Johnson*, 350 F.3d 956, 960 (9th Cir. 2003) (quoting *Kibler v. Walters*, 220 F.3d 1151, 1153 (9th Cir. 2000)). Only the second exception is at issue here.

---

[1] Under 28 U.S.C.A. § 2244(d)(1), "a person in custody pursuant to the judgment of a State court" must apply for a writ of habeas corpus within one year after the latest of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" or "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." It is undisputed that Rieman's Petition exceeded these deadlines.

1       Demonstrating a "miscarriage of justice" requires presenting "evidence of innocence
2 strong enough that a court cannot have confidence in the outcome of the trial unless the court is
3 also satisfied that the trial was free of nonharmless constitutional error." *Carriger v. Stewart*, 132
4 F.3d 463, 478 (9th Cir. 1997) (en banc) (emphasis and internal quotations omitted). To satisfy
5 this standard, the petitioner must prove that it is "more likely than not that no reasonable juror
6 would have convicted him in the light of the new evidence." *Griffin*, 350 F.3d at 961 (quoting
7 *Schlup*, 513 U.S. at 324). If a petitioner was charged with other crimes than they ultimately pled
8 to, "the petitioner's burden of demonstrating actual innocence must also extend to the more
9 serious charges." *Jaramillo v. Stewart*, 340 F.3d 877, 883 (9th Cir. 2003) (citing *Bousley v.*
10 *United States*, 523 U.S. 614, 624 (1998)).

11       When determining whether a petitioner satisfies the actual innocence standard, the court
12 is "not bound by the rules of admissibility that would govern at trial" and may be required to
13 "make some credibility assessments." *Schlup*, 513 U.S. at 327, 330. A petitioner should
14 nonetheless support their claim with "reliable evidence—whether it be exculpatory scientific
15 evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id*. at 324. The court
16 also should consider the prisoner's delay to the extent it undermines credibility. *McQuiggin v.*
17 *Perkins*, 569 U.S. 383, 386 (2013). The court's "function is not to make an independent factual
18 determination about what likely occurred, but rather to assess the likely impact of the evidence
19 on reasonable jurors." *Stewart v. Cate*, 757 F.3d 929, 938 (9th Cir. 2014). (quoting *House v. Bell*,
20 547 U.S. 518, 538 (2006).

21       "[T]enable actual-innocence gateway pleas are rare." *McQuiggin*, 569 U.S. at 386. The
22 Ninth Circuit has summed up the standard by stating that it "permits review only in the
23 extraordinary case" but also does not require "affirmatively proving innocence" when new
24

ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS - 6

evidence undercuts the reliability of the petitioner's guilt. *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011).

Here, Rieman was originally charged as a principal or accomplice with second-degree intentional and felony murder. Dkt. #58, Ex. 16; *see* RCW 9A.32.050 (second-degree murder); RCW 9A.08.020(3) (accomplice liability). He subsequently pled to manslaughter in the first degree with an aggravating factor. Dkt. #13, Ex. 1; RCW 9A.32.060. Because the crimes Rieman was charged with are more serious than what he pled to, he must establish innocence with respect to everything. *See Jaramillo*, 340 F.3d at 883 (citing *Bousley*, 523 U.S. at 624). To accomplish this, Rieman offers new evidence that basically falls into two categories: his testimony that Bremmer is the true killer and evidence showing Bremmer's pattern of strangulation and violent disposition. The Court will address each in turn.

1.  *Rieman's New Testimony*

Rieman's story in 2009 differed substantially from his testimony before this Court. On July 8, 2009, Rieman told police that he fell asleep around twilight on the night of the murder and was only woken up briefly around 11:30 PM by Bremmer digging around for a book or journal. Dkt. #77, Ex. D9, at 289. He went on to state that the next day Adkins was nowhere to be found on the boat, and he and Bremmer spent most of the day looking for him. *Id*. at 290-93. Rieman repeated this story to police a few days later, Dkt. #77, Ex. D11, at 609-19, and referenced parts of the story during phone calls from prison, Dkt. #77, Exs. D2, D7 at 8.

During the evidentiary hearing before this Court, however, Rieman testified that on the night of the murder he was woken up again by sounds of scuffling. Dkt. #129, at 128. When he went to investigate, he saw Bremmer standing over Adkins with a knife. *Id*. Rieman fought with Bremmer, disarming him but also getting cuts on his fingers. *Id*. 128-29; Dkt. #127, Ex. 15.

Bremmer then went to the sleeping quarters while Rieman sat with Adkins. Dkt. #129, at 129-30. After a few minutes, Adkins wandered toward the salon of the boat and suddenly disappeared from sight *Id*. at 130. When Rieman went to see what had happened, Adkins was on the ground with Bremmer standing next to him. *Id*. Bremmer pointed a gun at Rieman and proceeded to choke Adkins to death with an extension cord while Rieman stood watching. *Id*. at 131-32. After witnessing the murder, Rieman testified that he became Bremmer's unwilling partner, pretending to search for Adkins in Ilwaco while Bremmer threatened him with a gun. *Id*. at 135-39.

Rieman's story is not implausible, but it is also not inherently credible. Although fear can be a powerful force, Rieman's unwavering commitment to covering up the murder of his friend and taking the fall is somewhat unbelievable. Rieman had multiple opportunities to deviate from this course and turn Bremmer in, such as when Bremmer had a gun in his jacket and a body stashed on the boat the day after the murder. Dkt. #130, at 14-15. At that time, police could have easily identified Bremmer as the murderer. Rieman also engaged in a cover-up on his own when he asked his girlfriend to remove his rain jacket and other possessions from the boat while he was in jail.[2] Dkt. #77, Ex. 7, at 7. These acts and omissions suggest involvement in the murder just as easily as they do coercion. It is also noteworthy that Rieman's account sheds no light on the motive for the murder, which is surprising given the amount of time Rieman spent with Bremmer and Adkins. *Id*. at 126-27, 135-41.

Bremmer's competing narrative also has inconsistencies. When he was interviewed on October 19, 2009, Bremmer stated that he was locked in one of the bars in Ilwaco after closing and only returned to the Tiger after finally being let out by the bartender. Dkt. #39, Ex. 6, at 16.

---

[2] The Court notes that Rieman also told his girlfriend not to lie to the police during the same call. Dkt. #77, Ex. 7, at 5.

Upon arriving back, Bremmer said he could see a fight going on in the wheelhouse from the dock, and suddenly Adkins's head went through the side window of the boat. *Id*. at 8-9. Bremmer stated that at this point Rieman had seen him and he got on the boat, after which Rieman strangled Adkins. *Id*.

But Bremmer's account of the murder in 2009 was wandering. At first it seemed that Bremmer "climbed onto the boat" before he ever saw the fight; later, he specified that he first saw the fight from the dock. Dkt. #39, Ex. 6, at 5, 8-9. Bremmer also varied on whether he actually saw Adkins's head go through the window. *Id*. Bremmer's description of these events changed again during the evidentiary hearing before this Court, at which he testified that he only heard the fight and the broken window from the dock and only saw Rieman and Adkins once he stepped onto the Tiger. Dkt. #133, at 68-69. While time and intoxication[3] can partly explain these divergences, they are nonetheless noteworthy.

Parts of Bremmer's story are also contradicted by other evidence. For example, Bremmer's claim about getting locked in the bar was disputed by the owner and bartender, Dkt. #127, Ex. 13, and there is video footage of him disposing of what appears to be either a bag or a raincoat, despite earlier claims that he did not do so. Dkt. #127, Ex. 5; Dkt. #39 at 14. All of this leads the Court to doubt the reliability of Bremmer's story.

However, the problems with Bremmer's account do not create corresponding veracity for Rieman's. A jury weighing these two stories would be aware that each man has his own agenda and the truth may lie somewhere in between. This Court does not share Judge Creatura's belief that "either Rieman or Bremmer committed this homicide" and only "one of them is lying."

---

[3] Bremmer stated in his testimony that he was "very intoxicated" when he recounted his story to police in Hawaii. Dkt. #129, at 98.

Dkt. #87 at 5, 7. Besides the two men's conflicting stories, there is no obvious reason to believe they were not both involved in Adkins's murder. A jury would not necessarily take an all-or-nothing approach and assume that one man is telling the complete truth, especially with Rieman charged as an accomplice. Indeed, there is evidence that the two men worked together to conceal the murder and that both could be guilty.

And while Rieman was a more credible witness than Bremmer at the evidentiary hearing, the fact remains that Rieman told a completely different story to his family, the police, and his attorney and withheld his new account for years.[4] *See Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) (rejecting petitioner's claim of actual innocence based on contradictions with prior statements at plea colloquy). Rieman's inconsistencies and delay, along with the notable absence of any other physical evidence or third-party witnesses, prevent the Court from concluding no reasonable juror could convict Rieman when presented with his new testimony.

### 2. *Bremmer's Pattern of Strangulation and Violent Disposition*

Aside from offering his new version of events, Rieman also supports his actual innocence claim with evidence of Bremmer's violent conduct and several incidents involving strangulation. The Court is "not bound by the rules of admissibility that would govern at trial" when applying the actual innocence standard, but the Court must also make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 327-29. This requires ascertaining how jurors would be instructed to consider this evidence.

Federal Rule of Evidence 404(b)(2) allows the use of character evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack

---

[4] Rieman testified that these inconsistencies were the result of threats from Bremmer. However, as discussed *infra*, the evidence of this coercion is unconvincing.

of accident." Courts have held that evidence of modus operandi is admissible under "identity." *See, e.g., United States v. Moore*, 115 F.3d 1348, 1354 n. 3 (7th Cir. 1997). In *United States v. Torrez*, the Fourth Circuit determined that incidents in which the defendant strangled assault victims demonstrated intent and modus operandi with respect to a murder involving strangulation. 869 F.3d 291, 301 (4th Cir. 2017); *see also United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997) (finding that past incidents of sexual contact with minors were sufficiently similar to a subsequent sexual offense and noting that the past acts need only be "similar enough to be probative of intent").

In light of this, a jury would likely be instructed to consider evidence of Bremmer's prior acts involving strangulation.[5] However, it is unlikely that Bremmer's general history of violent and aggressive behavior would be admissible. *See United States v. Bettencourt*, 614 F.2d 214, 217 (9th Cir. 1980) ("A showing of intent to assault on an earlier occasion proves little, if anything, about an intent to assault at some later time."). Consequently, the Court will give more weight to the strangulation incidents described in sworn affidavits and court documents when coming to its "probabilistic determination." *Schlup*, 513 U.S. at 327-29.

Rieman introduces several affidavits showing Bremmer's pattern of strangulation. Bremmer's ex-wife, Patty Carrar, described one occasion when Bremmer wrapped a scarf around her neck and pulled on it until she went unconscious. Dkt. #127, Ex. 11. Debbie Lopez-Stitt also stated that Bremmer choked her with his hands before raping her, and Cynthia Villella recounted how Bremmer tried to strangle her with a seatbelt after the murder in Hawaii. Dkt. #127, Ex. 9,

---

[5] The Court notes that it is paradoxical to imagine how a jury could consider evidence of a crime that occurred years *after* the proceeding at issue, such as Bremmer's 2012 murder; nonetheless, that crime will be considered here because of the fairly forgiving evidentiary standard for the actual innocence inquiry.

10. In addition, Bremmer strangled his victim from the Hawaii murder with a rope after shooting him. Dkt. #127, Ex. 16. If Adkins was truly strangled, as both men claim, this evidence would likely point a jury toward Bremmer rather than Rieman, who does not have a similar record of violence.

General statements about Bremmer's violent disposition are much less probative. The same affiants described other abuse at Bremmer's hands, but this evidence would likely be inadmissible and sheds little light on the specific murder in question. Dkt. #127, Exs. 9-11. Bremmer's brother also described his violent disposition in an unsworn statement, and an acquaintance from Hawaii stated that Bremmer is an aggressive drunk and once indirectly referenced committing the murder in Ilwaco. Dkt. #39, Ex. 28; Dk. # 127, Ex. 7. However, without cross examination, these hearsay statements are unreliable and do little besides reinforce Bremmer's ugly and possibly boastful character.

The strangulation evidence, combined with the inconsistencies in Bremmer's narrative, convince the Court that a reasonable juror would be unlikely to believe Bremmer's story in its entirety. But a juror could find parts of Bremmer's story credible, and Rieman was initially charged as a principal *or* accomplice. Bremmer's violent and repugnant character does not change the physical evidence and Rieman's deceitful actions after Adkins's death.

The discovery of Rieman's and Adkins's blood in the wheelhouse near the broken window suggests that it was smashed during a fight between the two men, as Bremmer claimed. Dkt. #77, Ex. 13; Dkt. #39, Ex. 30. Rieman's current expert concluded the blood was inconclusive because it was "not indicative of ligature strangulation," Dkt. #39-29 at 4, but Rieman's trial attorney, Thomas Keehan, testified that the location of the blood spatter corroborated Bremmer's account and would have made success at trial difficult. Dkt. #139 at 47.

Rieman's alternate explanation—that the window was broken earlier and the blood was flicked from Rieman's fingers when they were cut during his fight with Bremmer—would require a jury to believe that the shared location of Rieman's blood, Adkins's blood, and the broken window were largely unrelated. While Rieman's explanation is not implausible, a jury would still likely view the physical evidence as an indication of Rieman's guilt.

Rieman also spent a day pretending to look for Adkins, helped dispose of his body, and lied to police for weeks after the incident. One natural explanation for these acts is that Rieman was involved in the murder and had reached an agreement with Bremmer that neither man would rat out the other. The only other rationale for Rieman's actions is that he was coerced by Bremmer, but there is no evidence besides Rieman's own testimony supporting this theory. While some jurors may view Rieman's testimony and Bremmer's history and conclude that Rieman was not involved in the murder, the Court cannot hold it is more likely than not that *no* reasonable juror would have convicted Rieman. *See Lampert*, 653 F.3d at 937. Rieman therefore does not pass through the actual innocence procedural gateway.

**B.      Involuntary Plea Claim**

Even if Rieman's involuntary plea claim was not procedurally barred, it would not succeed. A plea may be valid only if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007). "A guilty plea is coerced where a defendant is induced by promises or threats which deprive [the plea] of the nature of a voluntary act." *Id*. Threats of violence by a non-attorney third party can be sufficient to make a plea involuntary. *See Iaea v. Sunn*, 800 F.2d 861, 867 (9th Cir. 1986). Assessing voluntariness requires considering the "totality of the circumstances," including the defendant's state of mind and the "constitutional acceptability of the external

forces inducing the guilty plea." *Woodford*, 508 F.3d at 570 (quoting *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986)).

Because Rieman's claim was never adjudicated on the merits, this Court may consider evidence that was not presented in state court. *Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (holding that the restrictions on new evidence from *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011) do not apply to non-adjudicated claims). However, a "[p]etitioner's statements at the plea colloquy carry a strong presumption of truth." *Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (U.S. 1977) ("[T]he representations of the defendant [at a plea hearing] . . . constitute a formidable barrier in any subsequent collateral proceedings."). Here, Rieman represented before the state trial court that he signed his plea agreement in the absence of threats and the court thereafter made this finding itself. Dkt. #13, Ex. 3, at 44-56. Rieman's claim thus faces an uphill climb.

In his recent testimony, Rieman explained that his years of lying about the murder were the result of threats from Bremmer. Rieman recounted being severely shaken by witnessing Bremmer's brutality and feeling "completely terrified" of him afterward. Dkt. #129, at 135-37. According to Rieman, Bremmer told him that he could never expose what happened, coerced him into pretending to look for Adkins the next day, held a gun to his head during two phone calls, and told Rieman the story he should recount to police. *Id*. at 136-39. Because Bremmer and Rieman lived in the same trailer park, Rieman claims that Bremmer kept tabs on Rieman over the next week or so, checking to see what he said to police. *Id*. at 140-42. Rieman testified that Bremmer entered his trailer at one point and found the addresses of Rieman's children and grandchildren (who live in Hawaii), after which Bremmer insinuated that he would hurt them if

Rieman told the truth. *Id*. at 142-43. Because of all this, Rieman stated that he knew he could not go to trial because it would involve pointing the finger at Bremmer. *Id*. at 58, 153.

It is true that fear can cause people to act unreasonably, but Rieman's story strains this principle past its breaking point. Given the many opportunities Rieman had to take another path, the severity of the crime at issue, the length of time Rieman stayed silent, and the questionable nature of Bremmer's threats, it is not credible that Rieman was coerced into pleading guilty. Taking Rieman's story about the murder as true, it is somewhat understandable that he would have done what Bremmer said the day after the murder when the memory was fresh in Rieman's head and Bremmer was a direct threat. However, as more time passed, Rieman's actions become less relatable. Bremmer left for Hawaii after about nine days, at which time the danger to Rieman and his girlfriend greatly diminished. *Id*. at 141. Rieman still may have feared for his children and grandchildren in Hawaii, but he could have told them to stay at a hotel or even move while he talked to the police. This likely would have made sense regardless; if Rieman thought Bremmer was unstable enough to kill for revenge, could he not also kill out of suspicion?

Indeed, much of Rieman's conduct after his arrest could have caused Bremmer to become suspicious that Rieman intended to accuse him, undercutting Rieman's claim that he was terrified of Bremmer. Keehan, Rieman's trial attorney, testified that Rieman gave him names of character witnesses for Bremmer that could attest to his dishonesty and reputation for violence. *Id*. at 32, 34. Keehan also testified that Rieman never tried to limit the investigation to avoid the appearance of implicating Bremmer. *Id*. at 57-58. On jail calls with his girlfriend and others, Rieman repeatedly accused Bremmer of lying, expressed hatred for him, suggested that he may

be guilty of the crime, and showed his determination to expose Bremmer's falsehoods at trial.[6] Dkt. #77, Ex. D1-D7. This does not seem like the behavior of someone coerced into taking the fall for the heinous murder of his friend.

The Court acknowledges that Rieman stopped short of ever directly accusing Bremmer or providing details about the murder. This could suggest that Rieman feared what might happen if he told the whole story. However, it could also suggest that, even if Rieman genuinely disputed Bremmer's version of events, his own still implicated him somehow in the murder. This would better explain Rieman's initial willingness to go to trial and subsequent decision to take a plea. Rieman may have believed that he was not solely or even mostly at fault, but also recognized that the evidence was against him and his success at trial depended on a jury trusting him completely over Bremmer. If he lost, he faced a sentence of at least 20 years. This led Rieman to make a calculated decision and accept the plea offer, which even the trial judge described as a "heck of a deal." Dkt. #13, Ex. 3, at 14.

Outside of his own testimony, Rieman offers no direct evidence that he was threatened. Rieman never confided in anyone at the time, wrote anything down, or created any contemporaneous record that could have exposed Bremmer's actions later. Although Robert Augustus, one of Rieman's work supervisors in prison, testified that Rieman told him about the threats shortly before Bremmer was arrested for the Hawaii murder, even this evidence is based on Rieman's belated claims about what happened. Dkt. #129, at 14. In contrast, Keehan testified

---

[6] Rieman expressed the last points with particular intensity. He told his girlfriend on the phone, "And I'll tell you one thing, though: I'm not, I'm not pleading. I'm not going to …I would rather die than admit to doing something I didn't do." Dkt. #77, Ex. D7, at 13. Rieman testified that statements like this were intended to reassure his family and friends that he was not a murderer. Dkt. #130, at 28. This is reasonable, but it is also reasonable to assume that Rieman himself may have meant what he said and wanted to expose Bremmer at trial.

ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS - 16

that he never noticed any indications of fear in Rieman's demeanor or words, despite spending "many hours" with Rieman discussing his defense. Dkt. #129, at 26, 59. Bremmer even attempted to get on Rieman's good side after the murder by bringing a home-cooked steak dinner to his trailer. Dkt. #77, Ex. D6. While this strange act may have been intended to discourage Rieman from turning on Bremmer, it is not a method of intimidation.

The only other support for Rieman's claim is character evidence regarding Bremmer. As discussed previously, there are multiple affidavits and statements relating to Bremmer's violent and untrustworthy character, some of which also involve threats. Dkt. #127, Ex. 7, 9-11. Debbie Lopez-Stitt stated she was raped and subsequently threatened by Bremmer, although she called the police after a second encounter. Dkt. #127, Ex. 10. Bremmer's girlfriend from Hawaii, Cynthia Villella, also claimed that she believed Bremmer would kill her if she went to the police, although she too did so after Bremmer attacked her. Dkt. #127, Ex. 9.

These affidavits, along with Bremmer's recent murder conviction, suggest that Bremmer is capable of threatening someone after committing a crime. However, there is simply not enough evidence that he threatened Rieman in particular or that Rieman pled guilty as a result. Rieman's claim rests on his word alone, which is not enough to overcome the presumption that he spoke truthfully at his plea hearing, especially when the most obvious explanation for his plea is that he decided to cut his losses rather than risk going to trial. Consequently, Rieman's claim that his plea was involuntary fails.

## CONCLUSION

Aside from Erin Rieman and Walter Bremmer, no one will likely ever know what really happened that night aboard the Tiger. What is clear to this Court, however, is that Rieman's

1  belated testimony is insufficient to establish actual innocence or the involuntariness of his plea.
2  Rieman's Petition for Writ of Habeas Corpus is DENIED.
3        According to his counsel, Rieman has been excelling in an architectural drafting program
4  and complying with his post-release supervision since September 2019. The Court is glad
5  Rieman appears to be successfully moving on with his life. However, should Rieman decide to
6  appeal this decision, he has that right. Under 28 U.S.C. §2253(c)(2), a district court may issue a
7  certificate of appealability in a habeas matter if "the applicant has made a substantial showing of
8  the denial of a constitutional right." This requires "demonstrate[ing] that the issues are debatable
9  among jurists of reason [or] that a court could resolve the issues in a different manner." *Muth v.*
10 *Fondren*, 676 F.3d 815, 822-23 (9th Cir. 2012). Here, the Report and Recommendation of Judge
11 Creatura *did* resolve the issues in a different manner. A certificate of appealability is therefore
12 warranted.
13       IT IS SO ORDERED.

15       Dated this 14th day of May, 2020.

                                        Ronald B. Leighton
                                        United States District Judge